IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division



UNITED STATES OF AMERICA

v.

No. 1:23-cr-143

FEDERICO EZEQUIEL SANTORO VASSALLO,

Defendant.

## STATEMENT OF FACTS

The United States and the defendant, FEDERICO EZEQUIEL SANTORO VASSALLO (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Beginning in at least November 2019 and continuing thereafter up to and including September 2021, the exact dates being unknown, in Belgium, Chile, China, the Netherlands, Paraguay, Portugal, New York, and the city of Richmond, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant, FEDERICO EZEQUIEL SANTORO VASSALLO, did knowingly and unlawfully combine, conspire, confederate, and agree with other persons both known and unknown to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

    a. to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, and which involved the proceeds of specified unlawful activity, that is, an offense against a foreign nation involving the manufacture, importation, sale, and

1

distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act) as defined in Title 18, United States Code, Section 1956(c)(7)(B)(i):

    i. with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i); and

    ii. knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States:

    i. with the intent to promote the carrying on of specified unlawful activity, to wit: an offense against a foreign nation involving the manufacture, importation, sale, and distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act) as defined in Title 18, United States Code, Section 1956(c)(7)(B)(i), in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

    ii. knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity and knowing that such transportation,

2

transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United Sates Code, Section 1956(a)(2)(B)(i).

2. The defendant served as a Paraguay-based money launderer for South American, international drug traffickers. In particular, the defendant provided money laundering services for, and was a close associate of, Sebastian MARSET (MARSET). During the charged conspiracy, MARSET was the leader of a large-scale, drug trafficking organization that sent multi-ton shipments of cocaine, including as many as ten tons at a time, from South America typically to Europe. The MARSET drug trafficking organization trafficked cocaine in Bolivia, Paraguay, Brazil, Belgium, the Netherlands, Portugal, and elsewhere.

3. The defendant and MARSET utilized encrypted messaging networks to conduct drug trafficking and money laundering activities in secret. Sky ECC was one such platform used for encrypted messaging. The defendant was aware of MARSET's involvement in cocaine trafficking; for example, MARSET sent pictures of cocaine bricks to the defendant over the Sky ECC network.

4. After MARSET sent a shipment of cocaine to Europe, he would utilize the defendant to arrange for the collection of drug proceeds—typically in Euros—in multiple countries in Europe. The defendant would receive encrypted messages like "I have Holland ready 10mil eu," indicating than ten million Euros in narcotics proceeds were ready to be picked up in the Netherlands.

5. The defendant's money laundering activities involved several other individuals. These individuals ran money exchange businesses and coordinated the delivery or pick up of

money on the defendant's behalf. One such individual was co-conspirator 1 (CC-1), who arranged for the pickup of bulk Euros in Europe at the defendant's direction. Currency pickups typically utilized a token system, wherein a serial number from a bill is utilized to ensure that money is changing hands between the right people. That serial number then serves as a receipt for the transaction after the fact. MARSET, the defendant, and CC-1 all exchanged the same serial numbers as tokens to coordinate money pickups. CC-1's couriers would collect the narcotics proceeds, sometimes in suitcases on the side of public roadways in Europe. The money was at times hidden in secret compartments in vehicles to facilitate its movement. CC-1 arranged to pick up millions of euros over multiple occasions at the defendant's direction. The defendant had multiple people besides CC-1 who collected narcotics proceeds for him.

6. CC-1 had connections to approximately seven businesses in Europe that were willing to accept the illegal narcotics proceeds and then make transfers to accounts that were determined by the defendant. In order to facilitate those transactions, CC-1 created false invoices to make the movement of money appear connected to legitimate business, when in fact no such goods or services were actually being acquired. CC-1 sent the false invoices to the defendant in case of any scrutiny by law enforcement, financial regulators, or banks. CC-1 and the defendant also used the buying and selling of gold to generate the appearance of legitimate money that could then be wired to wherever in the world the defendant and/or MARSET wanted.

7. None of the wire transactions moving the currency out of Europe were linked on paper in any way to CC-1, the defendant, or MARSET. These transactions were designed to conceal their involvement and to promote the carrying on of drug trafficking.

8. MARSET and the defendant typically wanted the narcotics proceeds to be delivered in dollars. The defendant would provide specific account information to CC-1 for businesses

located primarily in Chile or China and state that he wanted a particular sum in dollars delivered there. CC-1 maintained a spreadsheet of the transactions that CC-1 initiated at the defendant's direction. CC-1 documented the movement of approximately $11,537,860.47 on the spreadsheet moving at the defendant's direction over an approximate 4.5 month timeframe during the charged conspiracy. Bank records corroborate the vast majority of the transactions on the spreadsheet, with records demonstrating specifically that $8,997,083.15 moved from Europe, through the U.S. correspondent banking system, and on to businesses located primarily in Chile and China. All of the U.S. banks involved in the movement of the $8,997,083.15 are FDIC insured.

9. One of these transactions initiated by CC-1 at the defendant's direction was on February 18, 2021. CC-1 caused $31,716.99 U.S. dollars to be sent from a bank in Portugal to a bank in China. A U.S. correspondent bank facilitated the transaction, with its server in Richmond, Virginia, which is located within the Eastern District of Virginia, processing and approving the transaction.

10. The defendant agrees venue and jurisdiction lie with this Court pursuant to 18 U.S.C. § 3238 and 18 U.S.C. § 1956(i). The defendant was first brought to the Eastern District of Virginia.

11. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

12. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: October 22, 2024         By: _____
                                   Anthony T. Aminoff
                                   Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, FEDERICO EZEQUIEL SANTORO VASSALLO, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
FEDERICO EZEQUIEL SANTORO VASSALLO

I am Ruben Oliva, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Ruben Oliva
Attorney for FEDERICO EZEQUIEL SANTORO VASSALLO