IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FEDERICO EZEQUIEL SANTORO VASSALLO,<br><br>　　Defendant. | Case No. 1:23-CR-143<br><br>Hon. Rossie D. Alston |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant comes before the Court for sentencing following his plea of guilty to a complex, prolific international money laundering conspiracy. The defendant conspired with major international cocaine traffickers, including his co-defendant Sebastian Enrique Marset Cabrera ("Marset"), to collect narcotics proceeds, conceal them as legitimate income, and transfer them internationally, frequently via the U.S. financial system, to further illegal cocaine trafficking. The conspiracy lasted for nearly two years, and it is impossible to know exactly how many millions were laundered. But in one 4.5 month time period, through only one of the defendant's many co-conspirators, ledgers document the movement of more than $11,000,000 U.S. dollars at the defendant's direction.

The government submits—and the defendant agrees—that as just punishment for this conduct, he should receive a sentence of incarceration of 180 months, or fifteen years. The guidelines support this sentence, as do the § 3553(a) factors, including the need for the sentence imposed to reflect the seriousness of the offense and to afford adequate deterrence to criminal conduct.

1

## I.    Factual Background

Marset lead a large-scale drug trafficking organization ("DTO"), operating primarily out of Uruguay and Paraguay, that sent cocaine all over the world, and particularly to Europe. Statement of Facts ¶ 2 (Nov. 21, 2024) (Dkt. No. 45) (hereinafter, SOF). Marset's DTO was almost unbelievably prolific, shipping as many as 10,000 kilograms at a time. *Id.* For context, an average dose, or line, of cocaine is estimated to contain approximately 20 and 50 milligrams of the drug. Rita Roque Bravo et al, Cocaine: an Updated Overview on Chemistry, Detection, Biokinetics, and Pharmacotoxicological Aspects including Abuse Pattern, 14(4) Toxins 278 (2022), https://www.mdpi.com/2072-6651/14/4/278. A single, 10,000 kilogram shipment by the Marset DTO thus provided somewhere between 200,000,000 and 500,000,000 individual doses of cocaine. In other words, with just a couple shipments, the Marset DTO would supply enough cocaine to get every man, woman, and child in Europe high.

The defendant was a close associate of Marset, and provided money laundering services to him and his organization. SOF ¶ 2. The defendant's money laundering activities involved finding people with the ability to collect bulk currency in foreign countries. SOF ¶ 5. The defendant then utilized a "token system," wherein the serial number of a particular bill was used to ensure the passage of bulk currency from the individuals selling the drugs to the defendant's couriers. *Id.* The serial number also served as a receipt for the transaction after the fact. The defendant then used co-conspirators to place the proceeds into a variety of businesses, whereupon fraudulent invoices were generated to document the fictitious movement of goods. SOF ¶¶ 5, 6. The defendant would then direct that the money be wired to particular accounts. The U.S. banking system facilitated many of these transactions due to Marset's preference for U.S. dollars. SOF ¶ 8.

One co-conspirator the defendant used to arrange for the collection and dissemination of narcotics proceeds was co-conspirator-1 (CC-1). SOF ¶ 5. CC-1 used approximately seven businesses in Europe that were willing to accept illegal narcotics proceeds to make transfers to accounts that were determined by the defendant. SOF ¶ 6. In CC-1's ledgers, CC-1 documented the movement of approximately $11,537,860.47 moving at the defendant's direction over an approximate 4.5 month timeframe during the charged conspiracy. SOF ¶ 8. Bank records corroborate the vast majority of the transactions on the spreadsheet, with the records demonstrating specifically that $8,997,083.15 moved from Europe, through the U.S. correspondent banking system, and on to businesses located primarily in Chile and China. *Id.*

As alleged in the Superseding Indictment, the defendant and Marset threatened violence against others in order to protect the carrying on of their drug trafficking and money laundering activities. Superseding Indictment ¶ 8 (March 7, 2024) (Dkt. No. 20). When CC-1 experienced difficulties in transferring money as directed by the defendant, or expressed concern about sending money to companies possibly under law enforcement scrutiny, the defendant threatened CC-1 with violence. PSR ¶ 26.

## II.    Procedural History

The defendant was charged by Indictment on September 7, 2023 with a money laundering conspiracy. Dkt. No. 8. On March 7, 2024, a Superseding Indictment was returned adding co-defendant Marset to the money laundering conspiracy. Dkt. No. 20. On July 12, 2024, the defendant made his Initial Appearance in the Eastern District of Virginia after being extradited from Paraguay. On November 21, 2024, the defendant entered a plea of guilty to the charge.

### III.    The Sentencing Guidelines

The government has no objection to the sentencing guidelines as calculated by the Probation Officer in the pre-sentence report ("PSR"). PSR ¶¶ 32—43.

### A.  The Base Offense Level of U.S.S.G. § 2S1.1(a)(2)

The government, the defendant, and the PSR all agree that the base offense level is 28. Pursuant to U.S.S.G. § 2S1.1(a)(2), the offense level is 8 plus the number of offense levels from the table in § 2B1.1 corresponding to the value of the laundered funds. As described in paragraph 8 of the defendant's Statement of Facts, a co-conspirator documented the movement of approximately $11,537,860.47 at the defendant's direction over an approximate 4.5 month timeframe during the charged conspiracy. As a result, 20 levels are added as the value of the laundered funds exceeds $9,500,000. The resulting base offense level is 28.

### B.  Specific Offense Characteristics

All parties also agree to the following Specific Offense Characteristics. Pursuant to U.S.S.G. § 2S1.1(b)(1)(B)(i), an additional six levels are added because the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote an offense involving, the manufacture or distribution of a controlled substance, to wit, cocaine. As described in Paragraph 3 of the Statement of Facts, the defendant was aware of Marset's involvement in the cocaine trade, and Marset even sent pictures of cocaine bricks to the defendant. Marset was also widely covered in the South American news during the time period of this conspiracy as a major drug trafficker. Furthermore, the defendant's modus operandi for financial transactions—using tokens, generating false invoices, and moving hugs sums of money in short time periods—is entirely consistent with drug money laundering. *See United States v. Carr*, 25

F.3d 1194, 1210 (3d Cir. 1994); *United States v. Ojeda*, 768 F. App'x 880 (11th Cir. 2019) (enhancement may be proved with circumstantial evidence of defendant's knowledge).

Pursuant to U.S.S.G. § 2S1.1(b)(3), an additional two-levels are added because the defendant was convicted under 18 U.S.C. § 1956.

Pursuant to U.S.S.G. § 2S1.1(b)(3), an additional two levels are applied because in addition to being convicted under 18 U.S.C. § 1956, the offense involved sophisticated laundering. The application notes point out that sophisticated laundering means complex or intricate offense conduct pertaining to the execution or concealment of the money laundering offense. The notes further suggest that sophisticated laundering might typically involve the use of fictitious entities, shell corporations, layering of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate, or offshore accounts. *See, e.g.*, *United States v. Amaris-Caviedes*, 701 F.App's 84 (3d Cir. 2017) (use of foreign bank account to launder funds sufficient to support enhancement; "offshore financial account" encompasses foreign bank accounts); *United States v. Ada*, 700 F. App'x 689, 690 (9th Cir. 2017) (finding enhancement where defendant deposited and transferred numerous stolen checks through multiple bank accounts with deceptive names; enhancement does not require defendant to use "fictitious entities, shell corporations, or offshore financial accounts"); *United States v. Ahuama*, 686 F. App'x 82 (3d Cir. 2017) (court need not find the specific factors enumerated in the guideline commentary when drawing conclusions regarding "sophisticated laundering;" sentencing judge may consider scheme in its entirety, including layers and levels of organization).

In this case, the money laundering activities clearly qualify as sophisticated. The defendant's co-conspirators used a token system to arrange for the transfer of bulk illicit currency. The defendant then used co-conspirators to place the proceeds into the bank accounts of overseas

businesses, generate false invoices, and send the money to other international businesses, a process designed to make the drug proceeds appear legitimate. The scheme involved numerous co-conspirators and huge sums of money.

### C.  Acceptance of Responsibility

The parties all agree that the defendant has accepted responsibility for the offense and that the offense level should be decreased by two levels pursuant to U.S.S.G. § 3E1.1(a). Furthermore, pursuant to U.S.S.G. § 3E1.1(b), the defendant has assisted authorities by the timely entry of his guilty plea, and the government hereby moves for an additional, one level reduction. As a result, the defendant's offense level is reduced in total by three points.

### D.  Guideline Calculation

The defendant's offense level is thus 35, and his criminal history is a Category I. His guideline range is therefore 168—210 months.

## IV.    Discussion

### A.  A Term of Imprisonment of 15 Years is Consistent with the Sentencing Guidelines.

Section 3553(a) requires the Court to consider the Sentencing Guidelines when sentencing a defendant. *See* § 3553(a)(4). Despite their advisory nature, the guidelines remain "the 'starting point' and 'initial benchmark' for sentencing." *United States v. Davis*, 855 F.3d 587, 595 (4th Cir. 2017) (quoting *Beckles v. United States*, 580 U.S. 256, 265 (2017)). While the guidelines do not constrain the Court's discretion, they nevertheless guide that "discretion by serving as 'the framework for sentencing.'" *Beckles*, 580 U.S at 265 (quoting *Peugh v. United States*, 569 U.S. 530, 542 (2013)).

The joint recommendation of the government and the defendant of 180 months is consistent with the Sentencing Guidelines, falling in the lower half of the recommended range.

**B.  3553(a) Factors Support the Recommended Sentence.**

In addition to being consistent with the Sentencing Guidelines, a term of imprisonment of 180 months is appropriate in light of the other § 3553(a) factors as well.

**1.  *Nature and circumstances of the offense***

The nature and circumstances of the offense weigh strongly in favor of a 15-year term of imprisonment. The scope of this conspiracy was massive. Almost unimaginable quantities of cocaine moved between continents, and millions of dollars in drug proceeds were laundered through the U.S. financial system back to the drug traffickers. In short, the conspiracy had far-reaching, transnational reach and consequences.

The defendant played a vital role in the conspiracy. He was a close associate of the leader of the drug trafficking organization and laundered millions in drug proceeds on his behalf. Money laundering is as vital to a drug trafficking organization as drug distribution. Without the ability to profit, drug traffickers would not engage in peddling poison. And it was the defendant's money laundering activities that most directly affected the United States, with millions of dollars of narcotics proceeds passing undetected through the U.S. financial system. Essentially, the defendant turned the U.S. financial system into a clearinghouse for Marset's drug proceeds.

The harms caused by the defendant's conduct are serious. To start, his money laundering activities allowed this drug trafficking organization to continue pumping cocaine throughout the world, which causes profound damage to society. Cocaine usage (including crack-cocaine usage) destroys lives and families. It can lead to addiction, long-term adverse health effects, and even death by overdosing. *See* Nat'l Inst. on Drug Abuse, DrugFacts: Cocaine (July 2018), *available at* https://www.drugabuse.gov/publications/drugfacts/cocaine (last visited July 14, 2025). Cocaine

mixed with fentanyl and similar substances is a major contributor to the rise in drug overdose deaths. *Id.*

International cocaine distribution organizations—like that of Marset's—corrode developing countries. They generate vast sums of money that they use to bribe law enforcement and corrupt other governmental institutions. They also engage in incredible acts of violence and savagery that can terrorize entire populations. Marset himself has been publicly linked to numerous acts of violence and threats of violence, including bombing an anti-drug brigade building in Montevideo, and threatening prosecutors and the news media. *See, e.g., Narcotrafficker Sebastian Marset threatens Uruguayan and Bolivian Journalists Using a Falklands' Chip Phone*, MERCOPRESS (Aug. 4, 2023), https://en.mercopress.com/2023/08/04/narcotraficker-sebastian-marset-threatens-uruguayan-and-bolivian-journalists-using-a-falklands-chip-phone. To be clear, there is no evidence that the defendant was involved in those threats or acts of violence, but his laundering activities allowed for this infamous organization to thrive and to continue to wreak havoc.

Given the magnitude of the offense, the defendant's central role in it, and the immeasurable harm that accompanies the international drug trade, the government submits that a term of 15 years imprisonment is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### 2. *History and characteristics of the defendant*

The history and characteristics of the defendant also warrant a significant sanction. The defendant is an educated man and was approximately 40 years old when the charged conspiracy began. PSR ¶¶ 52, 63. Over the ensuing years, he played an instrumental role in this drug-trafficking and money laundering organization, transferring millions of dollars at a time. For his own profit,

he allowed a reprehensible drug trafficking organization to thrive. This was not a momentary slip of judgment, nor the product of a young man making a rash decision. A sentence of fifteen years is also appropriate for this reason.

### 3. *The need to avoid unwarranted sentencing disparities*

The defendant has no co-defendants who have been sentenced in this case, and the Fourth Circuit has made clear that "comparisons of sentences [across different cases] may be treacherous because each sentencing proceeding is inescapably individualized." *United States v. Friend*, 1 F.4th 369, 382–83 (4th Cir. 2021) (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012)). In addition to the difficulty of comparing facts and circumstances across cases, it is also impractical to survey all money laundering convictions. The surest way to avoid unwarranted disparities is to carefully review, calculate, and consider the sentencing guidelines. *See United States v. Sueiro*, 59 F.4th 132, 141–42 (4th Cir. 2023) (citing *Gall v. United States*, 552 U.S. 38, 54 (2007) (explaining that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges")). But, to the extent it is helpful, other defendants have been sentenced to lengthy prison terms for laundering money for drug trafficking organizations, and a few cases with some similarities to the defendant's are provided below.

The most similar example within the district is *United States v. Xizhi Li* (1:19-cr-334, E.D. Va.). In that case, Li led a years-long scheme to launder money on behalf of Latin American drug trafficking organizations. His sentencing guidelines involved the same base offense level of 28 based on more than $9,500,000 being involved. Li was sentenced to 15 years incarceration.

In *U.S. v. Aguilar et al*, No. 1:13-cr-830 (S.D. Tx.), Oscar J. Aguilar was sentenced to 14 years for organizing a money laundering cell that crossed money from Brownsville, Texas, to

Matamoros, Mexico, where it was delivered to the Gulf Cartel. The indictment details less than $2 million dollars in transactions. The scheme involved Aguilar recruiting individuals to open bank accounts, which would then be used to move money in ways designed to avoid currency reporting requirements.

In other drug and gun cases routinely brought in this courthouse, defendants are often facing a mandatory minimum sentence of 10 or 15 years. In those cases, the amount of illegal drugs, the level of sophistication in committing the crime, and the amount of profit made off of the criminal activity is vastly different than in the defendant's case. The defendant operated at the very pinnacle of the international drug trade, albeit on the money laundering side of the criminal activity. His sentence should reflect his high-level involvement to avoid unwarranted disparities with local defendants whose crimes are of a much smaller scale.

### 4. *The need for deterrence*

Money laundering is a massive, global problem. The United Nations estimates that 2-5% of global GDP is laundered each year, or $800 billion - $2 trillion in U.S. dollars. United Nations Office on Drugs and Crime, MONEY LAUNDERING, https://www.unodc.org/unodc/en/money-laundering/overview.html (last visited July 14, 2025). These schemes can be highly complex and difficult to catch. As the risk of capture and conviction diminishes, so too will respect for anti-money laundering laws. Where the risk of detection is seen as relatively small, and the punishment for violations regarded as relatively slight, there can be no deterrence of these crimes. To promote respect for the law, and deter others, when a perpetrator like the defendant is arrested and convicted, the penalties for such crimes must be significant.

Furthermore, it is difficult to overstate the level to which the Marset drug trafficking organization has captivated the public's attention in South America. Marset's cases, and those of

his co-defendants (including the instant case), are frequently covered by the news media there.[1]

Money launderers linked to drug trafficking organizations will likely take notice of the sentence

that the defendant receives. A guideline sentence of 15 years would send the appropriate deterrent

message.

### V.        Conclusion

For all of the foregoing reasons, the United States respectfully submits that all of the factors

that the Court must consider—the guidelines, the nature and circumstances of the offense, the need

for deterrence, etc.—lead inexorably to a very substantial sentence of incarceration. Both the

defendant and the government believe that fifteen years is appropriate. Such a sentence is sufficient

but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Erik S. Siebert
UNITED STATES ATTORNEY

                                    /s/

Anthony T. Aminoff
Catherine Rosenberg
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov

---

[1] *See, e.g., Socio de Sebastian Marset Se Declara Culpable de Lavado de Dinero Ligado al Narcotraficante Uruguayo*, EL OBSERVADOR (May 22, 2025), https://www.elobservador.com.uy/nacional/socio-sebastian-marset-se-declara-culpable-lavado-dinero-ligado-al-narcotraficante-uruguayo-n6000659 (covering the defendant's guilty plea); *Capturan a la "mano derecha" de Sebastian Marset en Dubai*, VISION360 (July 4, 2025), https://www.vision360.bo/noticias/2025/07/04/27858-capturan-a-la-mano-derecha-de-sebastian-marset-en-dubai-segun-medios-paraguayos (describing the recent arrest of a close associate of Marset's in Dubai);  Jimmy Nomesqui Rivera*, El 'Pablo Escobar Uruguayo' No Solo Incursionó en el Narcotráfico, También Terminó Vinculado al Fútbol Profesional*, INFOBAE (June 3, 2025), https://www.infobae.com/colombia/2025/06/03/el-pablo-escobar-uruguayo-no-solo-incursiono-en-el-narcotrafico-tambien-termino-vinculado-al-futbol-profesional/ (recent article documenting Marset's links to professional soccer, and referring to Marset as the Uruguayan Pablo Escobar).

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of July, 2025, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system.

_____/s/_____

Anthony T. Aminoff
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov
