**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**ALEXANDRIA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>-against-<br><br>**FEDERICO EZEQUIEL SANTORO VASSALLO,**<br><br>        *Defendant.* | **No. 1:23 CR 143** |

_____

**DEFENDANT'S SENTENCING MEMORANDUM,
PSI NOTATIONS, AND REQUEST FOR VARIANCE
OR DOWNWARD DEPARTURE ON BEHALF OF
FEDERICO EZEQUIEL SANTORO VASSALLO**

_____

ROJAS & OLIVA, P.A.
Ruben Oliva, Esq.
Attorneys for the Defendant
Fountain Square
15800 Pines Boulevard
Suite 206
Pembroke Pines, Florida 33027

Gregory Todd Hunter, Esq.
Attorney for the Defendant
2111 Wilson Boulevard, 8th Floor
Arlington, Virginia 22201

1

**TABLE OF CONTENTS**

Preface .................................................................................................................... 3

Introduction ............................................................................................................ 4

I.     The Guidelines: Objections to the Advisory Sentencing
Guideline computation ............................................................................. 5

II.    Analysis of Section 3553(A) sentencing factors........................................... 8

     a.    Section 3553(a)(1): *the nature and circumstances of the offense and the history and characteristics of the defendant* ............................... 8

         1.    The Offense
         2.    History and characteristics of the Defendant

     b.    Section 3553(a)(2)(A): *the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense* .......................................................... 16

     c.    Section 3553(a)(2)(B) and (C): *the need for general deterrence and the need to "protect the public from further crimes of the defendant"* ................ 17

     d.    Section 3553(a)(6): *the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct* ............................................................... 19

     e.    Section 3553(a)(2)(D): *the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* .......................................... 22

III.   Departures and Variances: The Defendant merits sentencing leniency (whether labeled as variance or departure) as a consequence of the extraordinary acceptance of responsibility and rehabilitation, family circumstances, and other matters ......................................................... 23

     a.    Introduction ................................................................................. 22
     b.    The Defendant's extraordinary acceptance of responsibility.................. 23
     c.    Family circumstances and collateral consequences of his misconduct .................................................................................. 25
     d.    The combination of factors, including the Defendant's timely confession, cooperation, timely plea, family circumstances, collateral consequences, and assistance in the efficient administration of justice, considered together, warrants a departure or variance from the advisory guidelines ...................................... 28

IV.   Conclusion: The Minimally Sufficient Sentence....................................... 31

### PREFACE

The defendant, **FEDERICO EZEQUIEL SANTORO VASSALLO** (hereinafter referred to as Federico or Santoro Vassallo), respectfully requests that this Honorable Court adopt the recommended guideline calculations jointly proposed by the parties as well as the probation office. Those recommended guideline calculations result in a recommended sentencing range of 168 to 210 months. Furthermore, consistent with the plea agreement, the parties respectfully suggest that the defendant be sentenced to 180 months, or 15 years. In support of the recommended guideline calculation and suggested sentence, the Defendant will briefly discuss the guideline calculations, discuss the sentencing factors set forth in 18 U.S.C. § 3553(a), and note variances that provide further support or basis for this Honorable Court to adopt the recommended guideline calculations and sentence the defendant to no more than the parties' suggested sentence. In sum, Mr. Santoro Vassallo will humbly ask that this Honorable Court impose a sentence within the guideline range recommended by the parties and the probation office, and, specifically, to a sentence of 180 months as suggested by the parties consistent with their plea agreement. A sentence within the guideline sentencing range but not more than 180 months would be "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a). This memorandum is provided to assist the Court in arriving at a just and appropriate sentence. Beyond its contents, Mr. Santoro Vassallo looks forward to setting forth additional information at the sentencing hearing. As the Memorandum discusses in detail, we believe that, based upon all the facts and circumstances in the case, a sentence of 180 months in custody is reasonable and just.[1]

---

[1] The defendant was arrested on August 23rd, 2023 in Paraguay on domestic charges related to the offense conduct in this case. He was then indicted on September 7th, 2023 and immediately notified of the indictment in Paraguay. As a result of the Defendant's request for an expedited extradition he was extradited on July 11th, 2024. Defendant, through counsel, respectfully requests that this Honorable Court include a statement in the Judgment and Commitment Order requesting that the Defendant receive jail credit as of August 23rd, 2023. Pursuant to 18 U.S.C. 3585, "a defendant shall be given credit towards a term

## Introduction

Federico Ezequiel Santoro Vasallo comes before the Court in 2025, a different and better man than when he was involved in criminal activity. The Supreme Court, in *Pepper v. United States*, 131 S. Ct. 1229 (2011), emphasized the importance of considering events that transpire between the commission of the crime and the sentencing in the punishment decision. Federico Ezequiel Santoro Vassallo comes before the Court as a contrite and remorseful individual who has demonstrated by deeds and not just words that he is genuinely repentant and prepared to pay for his misdeeds and ready to return to society as a rehabilitated, productive, and law-abiding citizen.

After years of mandatory sentencing guidelines, the Supreme Court has restored the traditional power of federal district court judges to impose individualized sentences that are sufficient, but not greater than necessary to satisfy the statutory purposes of sentencing. The federal district court can now consider all the characteristics of the offender and the circumstances of the offense and reject advisory guidelines. This memorandum details Section 3553 factors, describes the background of Mr. Santoro Vassallo, the offense conduct, and other facts. We believe he is worthy of the Court's consideration.

There are few, if any, more tangible symbols of rehabilitation, repentance, and acceptance of responsibility than (1) immediate confession of guilt to the criminal charges, (2) not conducting pre-trial litigation but instead announcing his intention and desire to plead guilty, (3) entering a whole-hearted plea before the Court, and (4) affirming his intention to return to society as a rehabilitated and law abiding citizen by his genuine efforts to make amends for his actions. Among other things, these are the sentencing facts.

---

of imprisonment for any time spent in official detention prior to the date the sentence commences – (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence." 18 U.S.C. 3585.

Under *U.S. V. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three-step approach. (See Fed. R. Crim. P. 11(M), amended December 1st, 2007, and Amendment 741 of the Sentencing Guidelines, effective November 1st, 2010) First, the court is to resolve any disputed guideline issues and determine the *advisory* guideline range. Second, the Court is to consider if any factors may warrant a departure from the advisory guideline range. As before *U.S. v. Booker*, the court is to depart when it is warranted under the facts and circumstances of a particular case. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered." *U.S. v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005). See also, *U.S. v. McBride*, 434 F.3d 470 (6th Cir. 2006) (holding that guideline departures are still a relevant consideration for determining the appropriate guideline sentence). Third, the Court should determine whether a variance, a sentence outside the advisory guideline system, is warranted under the authority of 18 U.S.C. § 3553(a) to impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in the statute. Consistent with the required procedure, the Defendant will address (I) the advisory guidelines, (II) the statutory sentencing factors, (III) the departures and variances that might have applied, and finally, (IV) suggest punishment.

## I. THE GUIDELINES: OBJECTIONS AND/OR MODIFICATIONS TO THE ADVISORY SENTENCING GUIDELINE COMPUTATION

The defendant does not have any objections or proposed modifications to the PSR. The defendant's guidelines begin with a base offense level of 28 based on his participation in a conspiracy to launder more than $9,500,000, a six-level increase because he was aware that the funds were proceeds from narcotics trafficking, a two-level increase because he has been convicted of a violation of 18 U.S.C. §1956 and a two-level increase because of the sophisticated manner in which the funds were laundered. Along with the three-level reduction for acceptance of responsibility, the total offense level is 35. Since the defendant has no prior arrests or convictions,

his criminal history falls into Category I, resulting in a guideline sentencing range of 168 to 210 months.

The probation officer initially recommended a three-level increase pursuant to §3B1.1(b) for his role in the offense, but the Government contacted the probation officer and explained why the parties believed that an increase for role was not appropriate or applicable under the particular facts of this case. After carefully considering the government's arguments, the probation officer agreed to amend the PSR and not recommend an increase for the role in the offense. The defendant thanks both the Government for making the argument and the Probation Officer for accepting the parties' recommendation. It should be emphasized that a careful review of the case facts supports that an aggravating role adjustment should not apply. The very reason why an increase in the guidelines for the sophisticated manner in which the funds were laundered applies is why a role enhancement is not warranted.

The money laundering method in this case involved a global network of individuals who provided specific services that formed a chain capable of laundering significant amounts of drug proceeds. These individuals largely communicated using encrypted chat and telephone systems, which allowed them to remain anonymous while providing their services. These individuals set their fees, which they collected during the process of laundering the funds, and were independent contractors who worked for no one in particular. In addition, the same individual who might employ their services in one instance would be the person who would provide them with their services in another instance, depending on the flow or direction of the funds being transferred and laundered. None of the individuals in this network provided their services to a single individual, nor would they only seek the services of one individual. Instead, it was similar to brokers in a stock exchange who provide the means to transfer stocks from a buyer to a seller. None of the brokers are under the employ or direction of the other brokers in the exchange, and on any given transaction are either on one side or the other of the chain transferring the stocks. Each of the brokers collects

their fee as the stock passes through their hands. Just as with our modern stock exchanges, where the actual physical stock certificate is rarely seen or handled, currency was seldom transported or handled beyond the initial and final delivery. Finally, as indicated by the probation officer, those individuals, including the defendant herein, would be paid merely a tenth of a percentage of the fee charged for laundering the funds, which rarely surpassed two percent. Accordingly, the parties' agreement and the probation officer's recommendation properly reflected a correct determination that an increase for role in the offense was inappropriate and unwarranted.

As a result of no increase for the role being assessed against the Defendant pursuant to §3B1.1(b), the Defendant meets all but one of the requirements for a two-level reduction as a zero-point offender pursuant to USSG §4C1.1. One of the drawbacks of this money laundering system is that the money launderer who initially accepts the task of laundering the funds must rely on a chain comprised of anonymous individuals whose identities and locations are often unknown. The money launderer has to rely on the individual's membership in the network, recommendations from others, and past experience. Although this form of money laundering is usually fast, efficient, and successful, it can quickly become a nightmare if one of the individuals decides not to deliver their services and keep the funds. Although there are several reasons why this may occur, the outcome for the money launderer can be devastating and even fatal. Although the money launderer who first accepts the task may only earn a half a percent or less, they are held responsible for the entire amount if the money is lost. If the money launderer is unable to make good on the loss, the consequences can go beyond financial ruin to loss of limb or life. For this reason, when confronted with an individual who refuses to return the funds or deliver their service, or engages in a delay of either, the money launderer becomes increasingly desperate and distressed with each passing day. It is at this point that the money launderer may progress from asking and then begging to demanding and then threatening, particularly as he or she receives the same or worse treatment from the drug trafficker who entrusted him or her with his hard-earned profits. It was in this

context that the defendant, feeling desperate and powerless due to the individual's refusal to engage in a resolution, began to sprinkle threats into his many conversations on a chat application. The defendant had no intention of carrying out these threats, and it would have been incredibly difficult to do so even if he had intended to, since he did not know the individual's name or location. Nonetheless, the fact that he had no intention or ready means to carry out his threats, which were clearly uttered during the many conversations aimed at resolving the issue, is of no import in determining whether the threats were credible or not. Understanding the difficulty of convincing the Court that the threats should not disqualify the defendant from receiving a two-level reduction under USSG §4C1.1(a)(3), which he would otherwise have received, the defendant agreed to leave it up to the Government to decide whether or not the defendant should receive the reduction. In the end, the Government felt that while the defendant did not have a history of violence, took no steps to carry out the threats, and did not appear to have the intention of doing so, the purpose of the guideline was to deter defendants from uttering threats that the person receiving the threats would reasonably consider credible. The Government has stated unequivocally that the individual believed the threats were plausible, and neither the Defendant nor counsel can make a factual argument to the contrary.

## II.    ANALYSIS OF SECTION 3553(A) SENTENCING FACTORS

The Defendant's analysis follows.

### a.    Section 3553(a)(1): *the nature and circumstances of the offense and the history and characteristics of the defendant*.

#### 1.    The Offense

Concerning the nature of the offense, the Defendant recognizes that by his actions, he promoted the commission of a crime. Federico joined a conspiracy to launder drug proceeds. While none of the participants in the conspiracy lived in the United States and the proceeds came from drug trafficking, which had no connection to the United States, such conduct is still harmful to

society and deserves punishment. Mr. Santoro Vassallo's unfortunate involvement with money laundering has cost him his family, his savings, and his liberty.

### 2.    History and Characteristics of the Defendant

Federico Ezequiel Santoro Vasallo was born on June 6th, 1979, to Ezequiel Santoro DaSilva, a 74-year-old and retired travel agent, and Nilda Angela Vasallo de Santoro, 72, a housewife. His parents live together in Paraguay and have been happily married for over 50 years. Federico has only one sibling, his older sister Barbara Noelia Santoro Vasallo, age 49, who is a tourist wholesaler (she sells travel packages to travel agencies and agents) in Paraguay. Barbara and Federico were raised in a middle-class family under normal and uneventful circumstances. Federico is a high school graduate and he attended the Universidad Americana de Paraguay in Ciudad del Este for two years before deciding to drop out so he could work with his father at the family travel agency.

Federico married Luz Maria Soledad S. A., a commercial engineer, in 2004. Their daughter, Gisselle Magali S. S., was born a year later. Gisselle Magali, now 20, is a pastry chef studying nutrition at a university in Foz do Iguaçu, Brazil. Federico and Luz Maria were married for five years before their divorce in 2010. They have continued to be good friends and cooperative parents. In 2018, Federico married Maria Virginia Araki, an accountant and business administrator. Federico and Maria Virginia are the proud parents of a five-year-old son, Enzo Ezequiel, and a two-year-old daughter, Isabella.

After working in several fields, his father, Ezequiel, opened the family's first travel agency in Ciudad del Este, Paraguay, when Federico was 15. Exchange Tour, S.A. was successful from the outset due to Spain's economic boom, which drew many Paraguayans to travel there for work. The families' fortunes improved with their success. In 1997, Federico and his sister Barbara started working in the family business. However, following her marriage, Ezequiel became uncomfortable with his son-in-law's uninvited participation in the business, so he left the

Exchange Tour, S.A. agency to his daughter and opened another travel agency, Cell Tour, S.A., for himself and Federico.

While working at the travel agency, Federico became acquainted with a frequent customer who owned the master franchise for all McDonald's restaurants in Paraguay. Impressed with young Federico's work ethic and social skills, he offered Federico a job at one of his franchise locations in Asunción, Paraguay. Federico worked there from 2000 until 2003, when he was soon promoted to manager for the franchise. Unfortunately, the franchise had to be closed due to rising property rents for the location. Federico was laid off and received a generous severance payment, along with a referral to a vendor of the franchise. He went on to work in Arcor, a food distributor, from 2003 to 2005. In 2005, McDonald's called him to offer a better-paying job as the treasurer for another franchise owner who operated several locations. Despite his success with McDonald's, in 2006 Federico returned to work at his family's travel agency at his father's request, as the business continued to expand and his help was needed.

In 2007, Federico purchased an existing travel agency in Ciudad del Este called Ad Shey Turismo, S.A. For the next ten years, Federico worked diligently to expand the agency's reach and increase their revenue. By 2017, however, revenues and profits began a steady and significant decline due to the emergence of internet-based travel agencies and the faltering economic situation in Paraguay. After his father closed his agency and joined Federico, he realized that the business would only support one household. He decided to leave it in the capable hands of his father, who continued to operate the business until his retirement.

Federico went to work at a money exchange business owned by a family friend with whom he had developed a friendship during a trip to Argentina in 2017. After the trip, the friend offered him a job. Federico jumped at the offer, given the family travel agency's declining revenues, and he soon became the manager of one of the exchange houses' branches. When his friend suffered

10

significant business losses and closed several locations, a competitor quickly offered him the same job. It was in this exchange house that he learned about the dark side of exchange houses.

Money exchange businesses, known as *casas de cambio* in Spanish, are widespread across Latin America due to persistent inflation, currency instability, and strong demand for U.S. dollars. In many countries, such as Argentina or Venezuela, local currencies lose value quickly, prompting individuals and businesses to convert their money into more stable foreign currencies on a daily basis. These businesses thrive in tourist zones, border areas, and informal markets where cash is king, and banking systems may be inaccessible or heavily regulated.

Ciudad del Este, Paraguay, has an exceptionally high concentration of money exchange houses due to its strategic location at the Triple Border with Brazil and Argentina. It is a central commercial hub, with large volumes of cross-border trade—both legal and illicit—conducted in multiple currencies, primarily U.S. dollars and Brazilian reals. The city's loose financial oversight, high foot traffic, and thriving informal economy create ideal conditions for constant currency exchange, making *casas de cambio* essential to both day-to-day commerce and underground financial activity.

Federico's entry into money laundering began, like many crime stories, with a justification. Long before narcotics trafficking became prevalent (and pervasive) throughout Latin America, money exchange houses already existed, providing both a legitimate and vital service to law-abiding people and businesses, as well as less legitimate services to those who sought to avoid paying taxes, tariffs, and customs duties. Because of their traditional role in providing services to all comers, including those involved in unsavory enterprises, money exchange houses were viewed both by the public and by the authorities as a type of business that may provide services to individuals engaged in criminal activity but who were not themselves criminals. In other words, they were viewed similarly as head shops that cater to drug users, gardening supply companies that sell equipment and supplies to hydroponic marijuana growers, and gun stores that sell guns to

11

individuals who send them to drug cartels and paramilitary groups. They are viewed as being only technically involved in criminal activity, if at all, because they operate openly in brick-and-mortar shopping centers and commercial spaces, providing their services to businesses and individuals regardless of the source of the money.

There is no social stigma attached to operating a money exchange house in Paraguay. For generations, there have been few investigations or prosecutions of money exchange houses, despite all of them being established to support the same type of illegal conduct. Still, Federico now knows that he should have known better and made a better choice. After working his entire life in legitimate businesses, mostly alongside his family and friends, he was unable to resist the temptation of a higher income, despite knowing that his work would likely support tax evasion and other illicit activities.

To make matters worse, Federico entered this unsavory business at a time when the money exchange houses in Paraguay were just beginning to provide their services to narcotics traffickers. It is only in the past ten years that drug traffickers began to operate in countries like Paraguay, Uruguay, and Argentina. Because they are located thousands of miles away from the high mountain valleys of Colombia, Bolivia, and Peru, where coca is grown, none of these countries has traditionally had any significant involvement in exporting narcotics, particularly to the United States, which was the primary market for many years. However, over the last decade, drug traffickers have increasingly used ports on the southwest coast of Brazil to export cocaine to Europe, which has emerged as another significant market. The overland transportation routes from Colombia, Bolivia, and Peru, where the cocaine is manufactured, to the ports in southern Brazil go through Uruguay and Paraguay. Large amounts of cocaine are then shipped, mostly successfully, aboard cargo ships heading to large European commercial ports like Rotterdam, Antwerp, and Algeciras. This channel of cocaine distribution has exploded in size because of the lack of interdiction and prosecution by the Latin American and European countries, which have

not had the same commitment, investment, and engagement to interdict, investigate, and prosecute narcotics trafficking and traffickers as the United States.[2]

While working in this money exchange business, Federico was introduced to money launderers in Europe, as well as in Brazil, Bolivia, Peru, and other countries. Federico never met the customers, as the owner handled that, but he soon discovered that they were drug traffickers seeking to transfer and launder drug proceeds. He also found that nearly all the money exchange houses in Ciudad del Este (and many throughout Latin America) were engaged in this type of business, which was then viewed as simply a new type of customer for the same services they had provided for decades. This allowed Federico, just like many of his co-workers, to rationalize that their services were no more illegal than those of the others. It was a self-delusion that would come with a heavy price. He worked at this money exchange house for about 18 months. Once more, Federico was forced to leave the business because the owner of the money exchange had suffered significant losses from a Brazil-based money launderer who stole approximately $3 million. A warning to Federico of what could easily and frequently happen in this type of business. Another warning that he ignored to his detriment.

Having learned the methods used to transfer and launder funds, and, more importantly, the individuals who were part of a global network of money launderers, Federico decided to go at it alone. He began to provide services to local clients as well as to the network of money launderers who would employ his services to deliver funds to their clients. Shortly thereafter, he met a drug trafficker based in Uruguay who became his primary customer, which inexorably led to his

---

[2] Of course, it is this state of affairs which explains why the United States is prosecuting cases such as this one. The United States prosecutes certain international drug trafficking offenses under the theory of "effects on the United States." This means that even if the crime occurs entirely outside of the U.S. and doesn't directly involve U.S. citizens, the government may still prosecute if it can demonstrate that the illegal activity has a substantial effect on the United States, such as increased drug availability or violence. This approach is part of the broader "war on drugs" and stems from a belief that the U.S. has a right to protect itself from the negative consequences of drug trafficking, regardless of where the crime originates.

criminal charges in both the United States and his native country of Paraguay.[3] On August 23rd, 2023, Federico was arrested in Paraguay, and his entire life came crashing down.

Federico's first and only foray into criminal activity lasted only a few years and earned him only a modest profit, but it ended in a nightmare that has destroyed not only his life, but the lives of his wife and children too. At the time of his arrest, his wife, Maria, was also arrested and charged with aiding him in his money laundering activities, which is not true, and with aiding him in investing his earnings from his business, which may be partly true. Maria, a native Paraguayan of Taiwanese descent, has worked for a Taiwan-based, multinational manufacturer and wholesaler of purses, bags, and backpacks since she was only 19. The company, established in 1980, has branch offices worldwide, including the United States and Paraguay. She began her career at the company as a cashier and later rose to become the chief cashier for the Paraguay store outlet, which employs over 200 staff members. Over the fifteen years she has worked for the company, she has developed a close relationship with the owner, who resides in Los Angeles and Taiwan, as well as his son, who oversees the company's operations in Paraguay.

They consider her a member of their family, and they have paid for her education. She has earned bachelor's degrees in accounting and international commerce, as well as a master's degree in business administration (MBA). As one of the highest-ranking employees in Paraguay, she has been provided with company cars for both her business and personal use for several years. In 2021, she founded an eponymous company, in partnership with her employer, to invest in local real estate. They each invested approximately $90,000 but dissolved the company after suffering financial losses in 2021 and 2022.

---

[3] It should be noted that Federico was not the only individual who laundered funds for the drug trafficker, he had no direct involvement in the drug trafficking activities, and he was not a member of the drug trafficker's organization beyond providing money laundering services on an ad hoc basis.

The Paraguayan Government charged Maria with money laundering, alleging that her investment company, company car, and income from her job, which she has had for the past fifteen years, are all evidence of money laundering activities on behalf of her husband. Despite the owner of the company executing an affidavit, presenting documentary evidence, and offering to testify that they legitimately employ her, provide her with company vehicles for her use, and partnered with her in the unsuccessful but legitimate investment company, the Paraguayan government has proceeded with their prosecution. Worse, without the robust Constitutional rights afforded defendants in the United States, she has already been convicted of the charges and is currently on trial to determine her sentence.

Despite Maria's extensive ties to the community, she was denied bond and is currently incarcerated. The Paraguayan government has also made it very difficult for her minor children to visit her in jail, and they now live with their elderly grandmother. She is facing a sentence of no less than five years and possibly up to 20 years, despite there being no evidence that she participated in Federico's criminal activities and little, if any, evidence that she took any steps even to launder his profits. It is a prosecution that lacks direct evidence, instead relying on flimsy circumstantial evidence and rank speculation. As a result, it has strained the relationship and exponentially increased the shame and remorse that Federico is suffering as a result of crimes that he committed, but without any involvement by his wife, who had her own career and paid her own bills.

As a result of the married couple being charged in Paraguay, the government has seized all their assets, including everything acquired years before Federico's involvement in criminal activity and everything Maria had acquired before she ever met Federico. As a husband and a father, nothing weighs on Federico more than the suffering of his innocent wife and children. This is a defendant who knows that his own misguided choices led him into the world of money laundering and destroyed his family. While this is no excuse for his actions, it does shed light on his desire to remove himself from that life and repay his debts to society, primarily so that his wife can be free

15

and his children can thrive. To his credit, he acknowledges the grave mistakes he made years ago and has chosen to come forward and accept responsibility for his crimes.

In addition, though Federico requested and was granted expedited extradition to the United States, his Paraguayan charges, which pertain to the same conduct as the alleged offense in this case, remain pending. It is entirely possible that upon completing his sentence in the United States, he will be immediately detained upon his return to Paraguay and prosecuted for the pending case based on the same conduct, raising the same significant concerns the Sentencing Commission addressed in §5G1.3(d).

Letters from Maria, friends, and family consistently express that Federico is extremely remorseful for his actions and is a dedicated family man committed to the well-being of his loved ones. His dedication to his family has motivated him to come forward, make amends, and accept the punishment that will undoubtedly be imposed, all with the hope of eventually being reunited with his family. The letters are attached as Exhibit 1.

Like his wife and children, the rest of the Defendant's family longingly awaits his return. They all express their great love for him and the admiration and respect he has earned by deciding to make amends.

    **b.**     **Section 3553(a)(2)(A):** *the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

This is unquestionably an extremely serious crime. Save for the milliseconds when zeros and ones zoomed through a computer server in Virginia, all of the criminal activity, including the underlying activity, occurred far from the United States. The fact that a tiny string of zeros and ones passing in mere milliseconds through a computer server in Virginia allows the United States to indict, extradite, and sentence citizens of faraway lands to any period of incarceration reflects the seriousness with which our nation treats this kind of offense and promotes ample respect for the law, both here and in Paraguay.

No one knows better than Federico Santoro that his crimes were serious. He knows that he was an essential link in a long chain that serves to empower and enrich narcotraffickers. He knows that he faces more than a decade of incarceration here in the United States, along with another probable sentence for the same conduct when he returns to Paraguay. He knows that nearly all of his assets and properties are long gone. He knows that his wife is in jail, and that his children live with their grandmother, who is old and ill. Worse yet, Federico Santoro knows that he grew up in a family that taught him better, and that he married a woman who deserved more. All of this weighs heavily on him. As a husband, father, and son, there is no greater punishment. A sentence of more than a decade is more than sufficient to promote respect for the law and provide just punishment for the specific nature and extent of the defendant's criminal activities.

c.    **Section 3553(a)(2)(B) and (C):** *the need for general deterrence* **and** *the need "to protect the public from further crimes of the defendant"*

The sentence this Court will impose is not the only thing that deters others and protects the public from future crimes by this defendant. His wife is in jail for money laundering, despite never having laundered money. As a result of his decision to plead guilty promptly and make amends, Federico has been ostracized by many of his friends and family. The lives of his wife and children have been permanently altered, disrupted, and scarred as a result of his crimes. He worries not only about what his future may bring but also about the safety of his loved ones back in Paraguay as a consequence of his actions both before and after his detention. Yet he has continued to accept responsibility and make amends.

In more tangible terms, Mr. Santoro Vassallo's decisions and actions, and his subsequent exposure to threats against him and his loved ones, serve as a deterrent to all who might choose the same path. Mr. Santoro Vassallo's actions further militate against any need to protect society from future wrongdoing. He knows he faces an even longer sentence of incarceration for this offense if he is arrested again and recognizes the extraordinary reach of the United States justice

17

system.

Regardless of the jail sentence this Court imposes, there will be lifelong consequences. Mr. Santoro Vassallo will be returned to Paraguay when his sentence from this Court is complete, and once there, he will face certain danger from his former associates. He will live out the rest of his life with the anxiety and worry of retribution. His co-defendant, Sebastian Marset Cabrera, has publicly claimed, without any proof, that Mr. Santoro Vassallo is cooperating with the government. As a perceived cooperator, Mr. Santoro Vassallo will forever risk that either he or a family member might be murdered. He is, indeed, a pariah to his former associates, many of whom are violent and are well known for exacting retribution.

Research studies indicate that the severity of punishment does not have as significant a deterrent effect on crime as the certainty of being apprehended and punished. The Sentencing Project, a national nonprofit organization dedicated to research and advocacy on criminal justice policy issues, has published the following findings: Research to date generally indicates that increases in the certainty of punishment, rather than the severity of punishment, are more likely to produce deterrent benefits. Daniel Nagin and Greg Pogarsky, leading scholars on deterrence, conclude that "punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences." As one district court recently observed, "in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent." *United States v. Corchado-Aguirre*, WL 10383207, at 17 (D.N.M. Aug. 31, 2015). Federico faces a severe guideline sentence. His incarceration affords adequate deterrence for him and others.

Research has also consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime &

18

Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at the University of Cambridge. *See* Andrew von Hirsch, *et al.*, Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1.

Counsel would submit that there is no need for the defendant to be sentenced to incarceration solely to protect him from the public and that a sentence <u>above</u> what has been suggested is likewise unnecessary to deter others from engaging in the same criminal conduct herein.

**d.    Section 3553(a)(6):** *the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.*

Also, particularly relevant for Mr. Santoro Vassallo is that the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Before *Booker*, the then-mandatory Sentencing Guidelines effectively foreclosed any consideration of this sentencing factor unless the

Guidelines had not 'adequately' taken the circumstances into consideration." *United States v. Doe*, 412 F. Supp. 2d 87, 91 (D.D.C. 2006)

This factor is the most critical of the 3553(a) factors because it highlights whether an injustice has occurred. If like defendants charged with like crimes receive disparate sentences, then clearly an injustice has occurred. Moreover, trust in our courts and that a defendant will receive a fair hearing and sentence is lost, leading to abuse and injustice across the board. This factor mandates that our courts treat similarly situated defendants similarly so that accused individuals can be confident that they will not be singled out or treated unjustly.

 "Now that the Guidelines are advisory, however, judges are free—and perhaps required—to take account of sentence disparities when devising a punishment for a particular offender." *Id.* (emphasis added), *see also Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities—along with other § 3553(a) factors—when imposing sentences.")

While all cases and defendants within a case are unique, the principle of non-disparate sentencing is an important one, and we believe it should be invoked.

Of course, this defendant is genuinely unique in many ways, both in his criminal liability and in his efforts to rectify that culpability by making amends, making any comparison difficult. But a review of other sentences imposed by other Courts is instructive and supports the recommendation herein.

For whatever its value, those dispositions are described below.

1. ***United States v. Juan Carlos Mendez Caicedo, Lucas Salazar, and David Salazar,* Case No. Sealed-Cr-Sealed, EDNY**

All three of the listed defendants operated the most extensive money laundering operation in Colombian history. These defendants laundered funds for Luis Caicedo Velandia and Daniel Barrera-Barrera, two of the largest-scale drug traffickers ever prosecuted in the United States. The

20

Government estimated that these individuals laundered over $4 billion. Unlike Mr. Santoro Vasallo, these defendants voluntarily surrendered and cooperated with the Government (albeit after they were informed that they were under investigation by high-ranking Colombian police officers they had bribed) and, due to their substantial assistance, were sentenced in 2015 to **terms of probation**.

### 2. *United States v. F. G.,* **Case No. Sealed-Cr-Sealed, SDNY**

This is yet another case that is analogous to the defendant herein. The Defendant was a large-scale money launderer for the notorious paramilitary and drug trafficking organization based in Medellin, the *Oficina de Envigado*. The Defendant voluntarily surrendered and cooperated. Unlike Mr. Santoro Vasallo, the defendant was directly involved in drug trafficking and laundering drug proceeds. In 2015, he was sentenced to **five years of supervised release**.

### 3. *United States v. Gabriel Montoya aka Gabrielito,* **Case No. 08-Cr-356, EDNY**

This is a Colombian narcotics trafficker who voluntarily surrendered and cooperated and who labored undercover for several years. On February 3rd, 2012, he was **sentenced to a term of three years' probation.**

### 4. *United States v J.B.V.;* **Case No. Sealed-Cr-Sealed, Honorable Judge Sterling Johnson**

Another very analogous case, this individual was also charged with money laundering as part of the Don Lucho DTO investigation. This significant money launderer for both Colombian and Mexican drug trafficking organizations voluntarily surrendered and was released on bond. Four years later, **he was sentenced to probation**, despite his lack of solid results, as the information he provided did not lead to a 5k motion by the Government.

     **5.**    *United States v Aldemar Rojas Mosquera;* **Case No. Sealed-Cr-sealed, Honorable Judge Sandra L. Townes (R.I.P.)**

In another comparable case, this individual was also charged with money laundering in connection with one of the most successful drug traffickers in Colombian history. This significant money launderer, who was an actual accountant, voluntarily surrendered and was released on bond. In 2017, he was sentenced to **one year probation**. He was involved in the laundering of over $750 million.

     **e.**    **Section 3553(a)(2)(D):** *the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

A number of courts utilize the provisions of this section to focus on the rehabilitative ideal inherent in the punishment process. *Pepper v. United States*, 131 S. Ct. 1229 at 1242-1243 (2011), focuses on this criterion. This Defendant is highly remorseful for his misconduct. Everything Federico has accomplished since offering his cooperation speaks well of his rehabilitation potential. This Defendant (1) has a hopeful future awaiting him with good family, (2) acknowledges his guilt, and (3) expressed remorse in multiple tangible fashions, including immediately accepting responsibility and promptly negotiating a guilty plea, and most importantly, taking steps to make amends. At the same time, Federico is an educated man with experience in multiple legitimate business pursuits and no history of substance abuse; there is simply no educational, vocational or health care the Bureau of Prisons needs to provide. While the Court must consider the need for "treatment," additional prison time is not necessary to promote rehabilitation. Rehabilitation has already occurred.

III.   **DEPARTURES AND VARIANCES: THE DEFENDANT MERITS SENTENCING LENIENCY (WHETHER LABELED VARIANCE OR DEPARTURE) AS A CONSEQUENCE OF EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY AND REHABILITATION, FAMILY CIRCUMSTANCES, CONDITIONS OF CONFINEMENT, AND OTHER MATTERS**

   a.   **Introduction**

As this Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines, following the decision in *U.S. v. Booker*, 543 U.S. 220 (2005). After *Booker*, *Gall v. United States*, 128 S. Ct. 586, and *Kimbrough v. United States*, 128 S. Ct. 558, both decided on December 10, 2007. *U.S. v. McBride*, 511 F. 3d 1293 (11th Cir. 2007), made clear that district courts are only required to give "some weight" to the advisory guidelines, as they are to the other 18 USC § 3553 factors, and any attempt to give special weight to the sentencing guidelines is contrary to *Booker*. However, the Supreme Court has since gone further in its recent decision in *Nelson v. United States*, 129 S. Ct. 890 (2009), where the court reiterated what it said in *Rita v. United States*, 551 U.S. 338 (2007), that a sentencing court may not presume that a sentence within the applicable guideline range is reasonable but added "the Guidelines are not only not mandatory on sentencing courts, they are also not to be presumed reasonable."

However, as stated at the beginning of the memorandum, **the Defendant is not asking for the Court to grant a variance**. Instead, the purpose of noting these potential variances is to provide this Honorable Court additional factors and support for a sentence within the guideline sentencing range agreed to by the parties and the probation officer and to sentence the defendant to 180 months (and certainly no more) consistent with the parties' agreement. To that end, Mr. Santoro Vassallo offers the following:

   b.   **The Defendant's extraordinary acceptance of responsibility and rehabilitation.**

Soon after his arrest in Paraguay, the Defendant asked his attorney to request an expedited extradition. The defendant could have elected to remain in Paraguay, and it would not have been

23

difficult to delay his extradition for several years. This also would have allowed the Paraguayan government to continue its prosecution of Federico for money laundering. Upon conviction by the Paraguayan Government, he could have easily requested that the government deny the extradition request in light of his conviction and sentence in Paraguay for the same conduct. Instead, he was brought to the United States in short order.  The defendant's request for an expedited extradition, his plea of guilty without delay, and his efforts to make amends should be considered exceptional and extraordinary and deserving of consideration beyond what is provided in the guidelines.

Federico's decision to quickly and efficiently plead and accept responsibility in the United States is not adequately reflected in the sentencing guidelines. Counsel would submit that under U.S.S.G. § 5K2.0(a)(4), this Court may and should grant a downward departure based on the Defendant's extraordinary acceptance of responsibility. *See*, *U.S. v. Rogers*, 972 F.2d 489 (2d Cir. 1992) (defendant who exhibits a higher degree of contrition than contemplated by § 3E1.1 may, in an appropriate case, receive a downward departure).

Counsel is also advised of the following anecdotal information concerning other judges who have provided downward departures or variances based upon "super acceptance of responsibility." Judge William Dimitrouleas of the United States District Court for the Southern District of Florida granted a two-year downward departure for voluntary surrender in the case styled *U.S. v. Jose Willer Moreno Escobar a/k/a Mono Willer*, Case No. 12-CR-20796-WPD, DE 1.

In another case, the Honorable Federico Moreno, the Chief Judge for the Southern District of Florida, granted a two-level downward variance without any government opposition to two Spanish women who voluntarily surrendered to the Southern District of Florida. *See U.S. v. Martinez Ramos & Linares Manso*, Case No. 06-CR-20791, DE 575 (Martinez Ramos's voluntary surrender in November 2009 and JNC entered 3/18/2010) and DE 632 (Linares Manso's voluntary surrender in November 2010 and JNC entered 1/31/2011). These two women fought

extradition in Spain for several years before deciding to "voluntarily" travel to the United States to face charges.

Most recently, the Honorable Roberto Scola, also of the United States District Court for the Southern District of Florida, granted a thirty (30%) percent variance from the advisory guideline sentence solely based on the Defendant's voluntary surrender (which was post-**i**ndictment). *United States v. Nelson Galindo Godoy*, Case No. 12-Cr-20637-RNS (SDFL).

We all know that there is no black and white but only shades of gray, and it is for this reason that the Supreme Court wisely held that guidelines are just that – guidelines – and unshackled the courts at sentencing. As a district court succinctly and aptly stated many years ago: ***"Just like painting by the numbers is not art, sentencing by the numbers is not justice."*** *United States v. Kuhl,* 816 F. Supp 623, 627 (S.D.Calif. 1993). The defendant and counsel respectfully request that this Court consider the unique and unusual circumstances of this case and follow the parties' suggested sentence.

### c.   Family Circumstances and Collateral Consequences of his Misconduct: Risk of Danger to the family due to his cooperation.

It is widely rumored, alleged, and suspected in Paraguay that Federico is cooperating with the government. Regardless of the truth or falsity of those allegations, his family is in grave danger from individuals who wish to either silence Federico or punish the family members of cooperators in general. This is not speculation; there have been many murders of cooperators and/or their family members in the past in Latin America.

Cooperation with federal authorities entails psychological tolls that constitute a form of punishment. The Third Circuit has recognized that being revealed as a cooperator with the federal agents risks subjecting him to "possible criticism, public harassment, social ostracism, or even physical injury." *Lame v. United States Dep't of Justice*, 654 F.2d 917, 926 (3d Cir. 1981). The Second Circuit has held that "[m]any view a cooperating witness as a betrayer or informer; unquestionably,

such a person is not generally held in high regard. But the fairness of our system of criminal justice may best be seen in its treatment of those individuals held in low esteem." *United States v. Ming He*, 94 F.3d 782, 785 (2d Cir. 1996). Furthermore, the "prison code . . . requires inmates to be antagonistic to any inmate who cooperates with the Government in criminal prosecutions." *United States v. Vaulin*, 132 F.3d 898 (3d Cir. 1997).

**Sole source of support for his family:** Beyond the danger to himself and his family is the fact that Federico is the sole source of support, both financial and emotional, for his immediate family as well as for his children, who depend on him for their survival. Paraguay, despite its significant development in recent years, still lacks a safety net for its poorest citizens.

Federico's family circumstances may warrant leniency in sentencing. See *U.S. v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming a downward departure where defendant was sole support for her children); *U.S. v. Califano*, 978 F.2d 65 (2d Cir. 1992) (remanding for reconsideration in light of *Johnson*); *U.S. v. Leon*, 341 F.3d 928 (9th Cir. 2003) (affirming the district court's departure based on defendant's indispensable role in caring for his wife).

Federico supports his wife and children and contributes to his parents' living expenses as well.

**Longer jail term than ordered:** Federico may serve a longer jail term than requested by the Court due to the collateral consequences of separate DHS deportation proceedings, which will only commence once he is transferred from the BOP to ICE custody.[4]  Moreover, the conditions of confinement at the ICE deportation facility are poor. See *U.S. v. Ortiz*, 2007 WL 4208802 (D.N.J.) (The court varied from the Guidelines based on the horrible prison conditions where the defendant

---

[4]  *U.S. v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), recognizes the departure factors that, (1) because of his status as an "extraditable", (2) because he is ineligible for community release as otherwise statutorily mandated under 18 U.S.C. §§ 3621(b) and 3624(c), and (3) because he will essentially serve more time than required under the jail sentence and will have to go through ICE deportation proceedings, these factors may warrant a variance or departure.  The Defendant concurs.

was being held. The court had previously heard testimony regarding the prison conditions and granted a variance.)

Finally, if Federico is deported to his home nation, he may well be murdered shortly thereafter in retaliation for his suspected cooperation. Likewise, his family, from his children to his parents, must live with the fear of retribution.

**Bureau of Prisons Visiting Issues Unique to Federico Ezequiel Santoro Vassallo**: The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, Mr. Santoro Vassallo is a removable alien. Upon being sentenced, he will not be designated to a minimum-security camp. He might very well be designated to a BOP privately contracted facility without easy access from major cities. Visits from any family member will be complicated, few, and far between.

**Federico Ezequiel Santoro Vassallo's Incarceration as an Inmate and Removable Alien:** As already stated, Mr. Santoro Vassallo was extradited to United States. He immediately accepted responsibility for his involvement in this offense, began to make amends, and pleaded guilty. He also understands that, in addition to the further term of incarceration he may receive when he returns to Paraguay, he will not be eligible for certain benefits during his incarceration, and immigration authorities may hold him beyond any sentence imposed by this Court. Then he will assuredly be removed from the United States because of his conviction and alien status in the United States unless the Government seeks to protect him from harm. Moreover, his immigration status will preclude him from being designated to a minimum-security facility.

Mr. Santoro Vassallo is also aware that his immigration status will also not allow him to benefit from an early release to a community corrections facility (see 18 USC § 3624)[5] Rather, he

---

[5] *U.S. v. Navarro-Diaz*, 420 F. 3d 581 (6th Cir. 2005), *U.S. v Davoudi*, 172 F. 3d 1130 (9th Cir. 1999), *U.S. v. Charry Cubillos*, 91 F. 3d 1344 (9th Cir. 1996, *U.S. v. Farouil*, 124 F. 3d 838 (7th Cir. 1997), affirming

will be subject to additional immigration detention beyond any sentence imposed in this case until

he is eventually removed from the United States to his native Paraguay.

> **d.    The combination of factors, including the Defendant's timely confession, timely plea, family circumstances, collateral consequences, and assistance to the efficient administration of justice, considered together, warrants a departure or variance from the advisory guidelines.**

Throughout this memorandum, the Defendant respectfully invites this Court to consider

issues of departure and variance. In doing so, we respectfully invite consideration of the following

thought,

> Although departure authority is not a device for subverting the Guidelines, *see Bonnet-Grullon,* 212 F.3d at 709, its restrained use in limited circumstances can provide appropriate flexibility in an elaborate sentencing regime that, however thoughtfully constructed, could not possibly anticipate all of the circumstances that might arise in its application.

*U.S. v. Lauersen*, 362 F.3d 160, 168 (2d Cir. 2004).

There is a body of Circuit case law, preceding the Supreme Court's pronouncements in *Rita,*

*Booker* and *Koon* and thereafter suggesting this Court may separately, under the guideline regime,

and certainly now by variance, reward, (1) this Defendant's repentance by making amends in the

United States, (2) his timely confession and plea, (3) and his overall assistance to the

administration of justice.[6]

---

district court's discretion to consider this issue for a downward departure; and U.S. v. Pacheco-Soto, 386 F. Supp. 2d 1198, 1205 (D.N.M. 2005), *U.S. v. Bakeas*, 987 F. Supp. 44 (D. Mass. 1997), *U.S. v. Smith*, 27 F. 3d 649 (D.C.Cir. 1994), in which the district court did depart downward citing alien not entitled to minimum security camp and/or early release to community corrections center.

[6]  *U.S. v. Brown*, 985 F.2d 478, 482-83 (9th Cir. 1993) (under § 5K2.0, in light of defendant's confession, court can depart downward from the range if it determines that the two point reduction did not adequately reflect acceptance); *U.S. v. Miller*, 991 F.2d 552 (9th Cir. 1993) (voluntary restitution exhibiting extraordinary acceptance of responsibility can justify downward departure); *U.S. v. Farrier*, 948 F.2d 1125, 1127 (9th Cir. 1991) (*U.S. v. Gee*, 226 F.3d 885 (7th Cir. 2000) (affirms 2-level downward departure for acceptance of responsibility under § 5K2.0, where Defendant was not eligible for adjustment for acceptance under § 3E1.1 because went to trial.) *U.S. v. Faulks*, 143 F.3d 133 (3d Cir. 1998); *U.S. v. DeMonte*, 25 F.3d 343, 349 (6th Cir. 1994) (in computer fraud case, departure proper on ground that defendant admitted to crimes about which government had no knowledge, even though part of plea bargain to cooperate-remanded); *U.S. v. Lieberman*, 971 F.2d 989, 995-96 (3d Cir. 1992) (downward departure where Defendant offered to make restitution greater that amount taken, met with bankers and offered to explain how avoided detection, resigned his position and went to FBI to admit his embezzlement, pled guilty); *U.S. v Crumb*, 902

Federico's decision has had a positive and spiraling effect in this district. His expedited plea (1) saved time of limited judicial resources and (2) saved time of limited prosecutorial resources. Independent of the traditional reward for assistance, those results may also merit variance consideration.

The court may and should consider the defendant's reason for becoming involved in the criminal activity, his limited period involved in the criminal activity, his lack of large profits for his involvement in the criminal activity, and the collateral consequences he is suffering as a result of his crimes including the loss of his assets and the unjustified prosecution of his wife who is likely to serve a period of incarceration leaving his two small children without either parent.

In *U.S. v. Garcia*, 926 F.2d 125 (2d Cir. 1991), the court ruled that even in the absence of a government-sponsored USSG § 5K1.1 motion, the district court can depart downward where a defendant's plea induced others likewise to plead guilty, thereby clearing a busy trial court's calendar.

> Having found that mitigating circumstances such as those in Garcia's case have not been adequately considered by the Sentencing Guidelines, we must then determine if they are a permissible basis for departure from the Sentencing Guidelines. ***We conclude that the additional assistance rendered to the court in the disposition of the charges against the other defendants justified the departure from the Sentencing Guidelines. As Judge Daly found, Garcia's conduct "broke the log jam" in a multi-defendant case. ....This conserved judicial resources by facilitating the disposition of the case without a trial.***
>
> In cases such as this, the district court has "sensible flexibility" to depart in circumstances where departure from the Sentencing Guidelines has a reasonable basis. *See U.S. v. Lara,* 905 F.2d at 603 (citing *U.S. v. Palta,* 880 F.2d 636, 639 (2d Cir . 1989); *U.S. v. Correa-Vargas,* 860 F.2d 35, 40 (2d Cir . 1988)).

*Linares*, 926 F.2d at 128. See also, *U.S. v. Carrozza*, 807 F. Supp. 156 (D. Mass. 1992) (same), *aff'd*, 4 F.3d 70 (1st Cir. 1993). *Carrozza* notes,

> As the Court of Appeals for the Second Circuit has recognized, the Sentencing Guidelines do not address the value of the contribution made by a defendant whose

---

F.2d 1337, 1339-40 (8th Cir. 1990) (voluntary surrender nine days after issuance of warrant 9 month downward departure).

> plea of guilty also leads to the disposition of all charges against his co-defendants, resulting in the resolution of a substantial case "pending in the seriously over clogged dockets of the Courts of the United States." *U.S. v. Garcia,* 926 F.2d 125, 127-28 (2d Cir. 1991); *see also, U.S. v. Agu,* 949 F.2d 63, 67 (2d Cir. 1991) ("Cooperation with the judicial system can, in appropriate circumstances, warrant a departure"). ...

*Carrozza*, 807 F. Supp. at 159; *U.S. v. Shah*, 263 F. Supp. 2d 10, 37 (D.D.C. 2003) ("Because the Guidelines do not forbid consideration of facilitation of justice as a departure factor, a defendant's timely plea "and his actions ancillary thereto may have ameliorative consequences so far beyond ordinary expectations as to warrant a downward departure for conserving judicial resources and thereby facilitating the administration of justice.").

The Supreme Court explained that the federal judicial tradition is for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment. In reaching its individualized sentencing decision, the Court must fashion the least restrictive sentence that vindicates the sentencing imperatives of 18 U.S.C. 3553(a)(2). See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). As Judge Rakoff, of New York's Southern District, has aptly stated: Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis and moral responsibility can be reduced to the mechanical addition of a small set of numbers artificially assigned to a few arbitrarily selected variables contradicts common sense. Whereas apples and oranges may have but a few salient qualities, human beings, in their interactions with society, are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results. *United States v. Gupa*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014).

## IV.    CONCLUSION: THE MINIMALLY SUFFICIENT SENTENCE

Mr. Santoro Vassallo appreciates the opportunity provided by the Government to reach a negotiated agreement and make amends as best he can. He is repentant about his past and prayerful about his future. In arriving at a reasonable sentence, this Court is respectfully urged to consider the sage observations of Justice Anthony Kennedy. Justice Kennedy, in a speech to the American Bar Association, commented on the remarkable scale of imprisonment the federal and state courts of the United States employ in contrast to such other countries as England, Italy, France, and Germany. 16 Federal Sentencing Reporter 2 (December 1, 2003), 2003 WL 23475479. Justice Kennedy stated that "[o]ur resources are misspent, our punishments too severe, our sentences too long." He also addressed the adverse effect that the Guidelines have on the federal system:

> In the federal system, the sentencing guidelines are partly responsible for the increase in prison terms. The guidelines were, and are, necessary. Before they were in place, a wide disparity existed among the sentences given by different judges, and even among sentences given by a single judge. As my colleague Justice Breyer has pointed out, however, the compromise that led to the guidelines also led to an increase in the length of prison terms. We should revisit this compromise. The Federal Sentencing Guidelines should be revised downward.

*Id.* at *3. Less than two years later, the Supreme Court struck down the mandatory guidelines in *Booker,* and ever since then, district courts have exercised discretion in appropriate cases to sentence below the Guidelines, and the appellate courts and the Supreme Court have upheld such sentences.

> Justice Kennedy directly addressed the effect prison has on the human spirit, saying that:

> One day in prison is longer than almost any day you and I have had to endure. Alexander Solzhenitsyn describes just one day in prison in the literary classic "One Day in the Life of Ivan Denisovich." Ivan Denisovich had a ten-year sentence. At one point, he multiplies the long days in these long years by ten. Here is his final reflection: "The end of an unclouded day. Almost a happy one. Just one of the three thousand six hundred and fifty-three days of his sentence, from bell to bell. The extra three were for leap years."

*Id.* Justice Kennedy further addressed the concept of mercy in our criminal justice system. His

31

words, which were addressed to the power to pardon, are just as meaningful to a district court's power to consider mitigating circumstances in fashioning a sentence:

> A people confident in its laws and institutions should not be ashamed of mercy. The greatest of poets reminds us that mercy is "mightiest in the mightiest. It becomes the throned monarch better than his crown."...Give him only what you can give him. Give him another chance. Give him a priceless gift. Gift him liberty.

*Id*. at *4.

The parsimony provision, found in 18 U.S.C. §3553(a), imposes a statutory cap on sentences, regardless of the recommendation under the sentencing guidelines. The district court is required to impose the least severe sentence necessary to satisfy the four purposes of sentencing enumerated in the statute. Federico and his family appreciate the Court's consideration.

WHEREFORE, the Defendant respectfully files this sentencing memorandum.

Respectfully submitted,

**ROJAS & OLIVA, P.A.**
**Attorneys for the Defendant**
**Fountain Square**
**15800 Pines Boulevard**
**Suite 206**
**Pembroke Pines, Florida 33027**
**(305) 373-6868**
**ruben@rojasoliva.com**

By:_____
    RUBEN OLIVA, ESQ.
    F.B.N. 626074

**Gregory Todd Hunter, Esq.**
**Attorney for the Defendant**
**2111 Wilson Boulevard, 8th Floor**
**Arlington, Virginia 22201**

By:_____/s/ Gregory Hunter_____.
    GREGORY TODD HUNTER, ESQ.

32

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing sentencing submission has been furnished via email on June 4th, 2025, to Anthony Aminoff, A.U.S.A., and Kelly Smihal, United States Probation Officer.

By:_____
RUBEN OLIVA, ESQ.